IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION AT MEMPHIS

| | |
|---|---|
| KYLE MAXWELL,<br><br>    *Plaintiff,*<br><br>v.<br><br>the CITY of MEMPHIS, TENNESSEE, and MPD officers BOWEN, DAVIS, DEBOWES, HILLERMAN, JONES, and TUCKER<br><br>    *Defendants.* | Case No.<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

THE PLAINTIFF, Kyle Maxwell, sues the above-named Defendants, and would respectfully state and allege the following for his causes of action:

**I.**

**NATURE OF THE ACTION**

1.  This is a civil-rights action for damages sustained by a United States Citizen when he was physically assaulted in his home by multiple officers of the Memphis Police Department (the "MPD"), a division of the City of Memphis, Tennessee (the "CITY"). During this encounter, which should have never happened in the first place, PLAINTIFF was violently tackled to the ground by multiple officers and severely bitten, without any cause, by an MPD police dog named CAESAR that,

upon information and belief, the MPD had knowingly deployed into the filed without proper training or certification.

## II.

## **JURISDICTION AND VENUE**

2. This action is brought pursuant to 42 U.S.C. §§ 1983, 1985, and 1988; the Fourth and Fourteenth Amendments to the United States Constitution; and comparable provisions of Tennessee law. This Court has jurisdiction over the federal causes under 28 U.S.C. §§ 1331 and 1343(3), (4).

3. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 to adjudicate all state-law claims pendent to the federal claims that are the thrust and gravamen of this action.

4. Under 28 U.S.C. § 1391(b)(2), venue for this action is properly laid in the Western District of Tennessee, within the territorial boundaries of which occurred all acts, transactions, and events pertinent and giving rise to this action.

## III.

## **PARTIES**

5. The Plaintiff, KYLE "MAXIE" MAXWELL, is an adult resident of Shelby County, Tennessee, a black man, and a citizen of the United States. He suffers from severe visual impairment to the point that he is legally blind.

6. The CITY is a municipal corporation chartered by, and located within the territorial boundaries of, the State of Tennessee. At all pertinent times, the CITY

employed the individual defendants and was responsible for the training and certification of its K-9 units, including CAESAR. The CITY is sued as a person under 42 U.S.C. § 1983.

7. Individual defendants:

(a) Sergeant SHANNON BOWEN (IBM # unknown) is, and all pertinent times was, the Canine Certified Trainer / Instructor for the MPD's K-9 Unit. As such, she was the MPD's primary canine trainer and held supervisory authority and responsibility for the training and certification of all MPD police dogs and police-dog handlers. She was required to document any training deficiencies or problems with any police dog or handler and charged with determining which dogs would be placed into service and under what conditions.

(b) Officer ALVIN DAVIS, IBM # 3246, is, and at all pertinent times was, a uniformed police officer employed and commissioned by the MPD to perform law-enforcement duties in the CITY. At all pertinent times, he was acting individually and as the agent, employee, and servant of the CITY. He is known to have been one of the officers that interacted with Plaintiff during the below-described events, but the precise role he played in those events is unknown at the time of this filing. Plaintiff was unable to observe Officer DAVIS's role in the incident, because of Plaintiff's visual impairment. Furthermore, counsel has been unable to ascertain Jones's rile in the incident, despite diligent inquiry, because the CITY denied counsel's January 28, 2021 public-records request that specified documents pertaining to the subject event.

(c) Officer DEBOWES (first name unknown), IBM # 13442, is, and at all pertinent times was, a uniformed police officer employed and commissioned by the MPD to perform law-enforcement duties in the CITY. At all pertinent times, he was acting individually and as the agent, employee, and servant of the CITY. He is known to have been one of the officers that interacted with Plaintiff during the below-described events, but the precise role he played in those events is unknown at the time of this filing. Plaintiff was unable to observe Officer DEBOWES's role in the incident, because of Plaintiff's visual impairment. Furthermore, counsel has been unable to ascertain Jones's rile in the incident, despite diligent inquiry, because the CITY denied counsel's January 28, 2021 public-records request that specified documents pertaining to the subject event.

  (d)  Officer HILLERMAN (first name unkown), IBM # 13645, is, and at all pertinent times was, a uniformed police officer employed and commissioned by the MPD to perform law-enforcement duties in the CITY. At all pertinent times, he was acting individually and as the agent, employee, and servant of the CITY. He is known to have been one of the officers that interacted with Plaintiff during the below-described events, but the precise role he played in those events is unknown at the time of this filing. Plaintiff was unable to observe Officer HILLERMAN's role in the incident, because of Plaintiff's visual impairment. Furthermore, counsel has been unable to ascertain Jones's rile in the incident, despite diligent inquiry, because the CITY denied counsel's January 28, 2021 public-records request that specified documents pertaining to the subject event.

  (e)  Officer PATRICK JONES, IBM # 6898, is, and at all pertinent times was, a uniformed police officer employed and commissioned by the MPD to perform law-enforcement duties in the CITY. At all pertinent times, he was acting individually and as the agent, employee, and servant of the CITY. He is known to have been one of the officers that interacted with Plaintiff during the below-described events, but the precise role he played in those events is unknown at the time of this filing. Plaintiff was unable to observe Officer JONES's role in the incident, because of Plaintiff's visual impairment. Furthermore, counsel has been unable to ascertain Jones's rile in the incident, despite diligent inquiry, because the CITY denied counsel's January 28, 2021 public-records request that specified documents pertaining to the subject event.

  (f)  Sergeant MARCUS TUCKER, IBM # 2864, is, and at all pertinent times was, a uniformed police officer employed and commissioned by the MPD to perform law-enforcement duties in the CITY. At all pertinent times, he was acting individually and as the agent, employee, and servant of the CITY. He is known to have been one of the officers that interacted with Plaintiff during the below-described events, but the precise role he played in those events is unknown at the time of this filing. Plaintiff was unable to observe Sergeant TUCKER's role in the incident, because of Plaintiff's visual impairment. Furthermore, counsel has been unable to ascertain Jones's rile in the incident, despite diligent inquiry, because the CITY denied counsel's January 28, 2021 public-records request that specified documents pertaining to the subject event.

8. At all pertinent times and in all their acts or omissions as described below, Defendants BOWEN, DAVIS, DEBOWES, HILLERMAN, JONES, and TUCKER were acting under color of state law and pursuant to their actual or perceived authority as police personnel for the CITY.

## IV.

## GENERAL ALLEGATIONS

9. At all pertinent times, PLAINTIFF lived and maintained a private residence in the north wing of First Congregational Church (the "Church"), located at 1000 South Cooper Street in Memphis, Tennessee. He was (and is) one of several persons permanently residing at that location, which also houses Hostel Memphis and hosts multiple community organizations.

10. On the evening of January 24, 2021, Church clergy members called the MPD to report a break-in of the Church's "food pantry," which is located in the Church's basemen under the south wing of the building.

11. The clergy members were not present at the Church building, but they could see the break-in in progress via surveillance-video feeds that they were able to access remotely.

12. The clergy members remained on the phone with MPD dispatch, watching the live video feed, while waiting on uniformed patrol to arrive. They informed MPD dispatch that the break-in occurred in the south wing of the building and that the suspects had entered the Church premises through a broken basement window.

13. Before the police arrived at the Church, one of the clergy members told MPD dispatch that she (the clergy member) was, in real time, watching the suspects flee the Church premises, exiting through the same broken window they had entered, then running southward down Cooper Street—the opposite direction from the part of the building where Plaintiff lived. Thus, the MPD had actual notice, prior to any officers arriving on scene, that the burglary suspects had fled the Church basement through the broken basement window and run off down the street.

14. At some point, Defendants DAVIS, DEBOWES, HILLERMAN, JONES, TUCKER, or some combination thereof, arrived at the Church and began exploring the upstairs portions of the premises' north wing. These officers had no business being upstairs in—let alone in the north wing of—the Church building, and their presence there served no legitimate law-enforcement purpose, because the MPD knew the break-in had occurred at the opposite end of the large building, knew the suspects had entered and exited the basement directly through a basement window, and knew the suspects had fled in the opposite direction of the north wing.

15. Neither the clergy members nor anyone else invited the officers on scene to enter or search the north wing of the Church or, indeed, any part of the Church other than the basement under the south wing.

16. At some point, the dog CAESAR arrived at the Church and was permitted to prowl the upstairs portion of the north wing of the Church building without a leash.

17.   Defendant JONES on information and belief, but in any event one or more of the officers on scene, was acting as CAESAR's handler and had responsibility to make sure the dog did not attack or injure any innocent persons while deployed on the Church premises.

18.   All of the above was initially unbeknownst to PLAINTIFF, who was enjoying a quiet evening in his residence.

19.   At approximately 10:30 PM, as PLAINTIFF was standing in his private kitchenette, preparing to wash some dishes, he was suddenly set upon by Defendants DAVIS, DEBOWES, HILLERMAN, JONES, TUCKER, or some combination of these persons.  Although PLAINTIFF was posing no threat to anyone as he stood alone in his kitchenette, the Defendants set upon him suddenly, without announcing themselves, and violently tackled him to the ground.

20.   The assailant officers had no reasonable grounds for suspecting PLAINTIFF had anything to do with the break-in, because they knew the break-in suspects had fled the Church building and fled in the direction opposite from where the officers found PLAINTIFF.

21.   Because the Church building is home to permanent residents, houses a hostel, and hosts space for a variety of community organizations, it is entirely normal for persons to be present after hours in the north wing of the building.  Therefore, PLAINTIFF's presence in the building, even after hours, gave no probable cause to suspect PLAINTIFF of criminal activity.

22. At the time the assailant officers set upon PLAINTIFF, they had no reasonable, articulable basis for suspecting that PLAINTIFF, standing alone and unarmed in his private kitchenette, posed a threat to their own safety or that of anyone else.

23. Had the assailant officers announced themselves prior to attacking PLAINTIFF, PLAINTIFF would have identified himself and explained that he was standing in his own living space.

24. The unreasonably violent and aggressive takedown of PLAINTIFF by the assailant officers caused PLAINTIFF extreme fright (exacerbated by PLAINTIFF's visual impairment, severe pain, and bodily injury—including but not limited to a bruised tailbone and a swollen "knot" on his forehead. The injuries to PLAINTIFF's tailbone and forehead were caused by his impact with the ground.

25. While PLAINTIFF was on the floor of the kitchenette, being held down and restrained by multiple officers, he was attached by CAESAR. CAESAR bit

PLAINTIFF multiple times, inflicting on PLAINTIFF's left calf the wounds pictured below:

 

26.     As an MPD canine, CAESAR was or should have been trained not to bite persons who were under restraint and posing no threat, absent a specific directive from his handler. PLAINTIFF therefore alleges, upon information and belief, that one or more of the Defendant officers on scene instructed CAESAR to bite PLAINTIFF while PLAINTIFF was on the ground, restrained, and posing no threat.

27.     Upon information and belief, neither CAESAR nor Defendant JONES as his canine handler had received proper training or were current on their respective certifications as of January 24, 2021.[1]

28.     The assailant officers appeared to struggle to get CAESAR under control as the attack dog continued to bite into PLAINTIFF's flesh. This apparent difficulty

---

[1] The CITY largely confirmed this suspicion by deliberately and without legal basis withholding information about CAESAR's training and certification history, despite undersigned counsel's January 28, 2021 public-records request specifying such documents.

9

was in itself probative of inadequate training and improper deployment of both dog and handler.

29. After CAESAR stopped biting PLAINTIFF, the assailant officers placed PLAINTIFF in handcuffs and demanded that he justify his presence *in his own home*. This caused PLAINTIFF significant fright and distress.

30. Eventually, the assailant officers were able to get Church clergy on the phone and confirm that PLAINTIFF was telling the truth. They provided substandard medical care for his wounds and released him with half-hearted apologies.

## VI.

## TWO TARNISHED BADGES

31. The MPD disciplinary files of Defendants DAVIS and JONES show multiple incidents of dishonesty, violence against women, and general moral turpitude, posing a risk to the public and contempt for written MPD regulations.

32. Instead of seriously disciplining Defendants DAVIS or JONES, the CITY has downplayed the charges referenced in the preceding paragraph, frequently with rubber-stamp dismissals, protected DAVIS and JONES from serious scrutiny, and continued to employ them despite knowing the danger they pose to citizens.

## VII.

## **CUSTOM, PATTERN, AND PRACTICE**

33.    At all pertinent times, the CITY maintained, tolerated, and failed to remedy customs, patterns, and practices within the MPD generally, and involving the use of police attack dogs in particular, that exhibited a deliberate and callous indifference to the dignity and constitutional rights of the citizens that MPD officers were likely to interact and had sworn to protect.

34.    It has long been—and at all pertinent times was—the CITY's regular custom and practice to inadequately and improperly investigate reports of misconduct by subordinate members of the MPD, including Defendants DAVIS and JONES.  The City routinely did and does downplay and tolerate instances of egregious police misconduct, including misconduct substantially similar to that described above, and it shields bad cops like DAVIS and JONES from public scrutiny or serious disciplinary action.

35.    It was and is the custom and practice of the CITY to inadequately train and supervise its subordinate officers, including DAVIS, DEBOWES, HILLERMAN, JONES, and TUCKER, thereby failing to adequately discourage use-of-force and other policy or constitutional violations on part of these officers.

36.    The City had been sued numerous times prior to the events described above.  Upon information and belief, many allegations in those prior lawsuits were true and put the CITY on notice that use-of-force and other policy and constitutional violations were occurring with unacceptable frequency within the MPD.

37. As a result of the CITY's above-described customs, patterns, and practices, the individual Defendants reasonably believed that even objectively unreasonable uses of force against civilians would not subject them to serious discipline by their employer.

38. As a result of the above-described customs, patterns, and practices, the assailant officers reasonably believed that their misconduct would not be sanctioned or seriously investigated, but instead would be tolerated and, if investigated, covered up.

## VIII.

## FEDERAL CAUSES OF ACTION

39. The allegations set forth in paragraphs 1–40 are reiterated and incorporated by reference as if fully set forth hereunder.

40. The above-described customs, patterns, and practices of the CITY reflect deliberate indifference to the rights of persons under the custody, care, or control of MPD officers and were a proximate cause of the indignity and injury suffered by PLAINTIFF at the hands of the MPD.

41. The assailant officers' setting upon PLAINTIFF, placing him in physical restraints (handcuffs), and holding him in custody was a seizure for purposes of the Fourth Amendment. The assailant officers violated PLAINTIFF's corresponding rights by effecting this seizure without any probable cause to suspect PLAINTIFF had or was committing any criminal offense and without any reasonable, articulable suspicion for officer safety.

42. The assailant officers' use of force against PLAINTIFF, in violently tackling him to the ground (and especially in doing so without any warning or identification) was objectively unreasonable, particularly in that

    (a)    PLAINTIFF was not suspected of committing any crime;

    (b)    The most serious crime *in consideration* that night was the nonviolent attempted burglary of a charity food pantry;

    (c)    PLAINTIFF was posing no risk whatsoever to the safety of the assailant officers or anyone else; and

    (d)    PLAINTIFF was neither resisting arrest nor trying to evade arrest by flight.

43. The use of a police attack dog on PLAINTIFF was objectively unreasonable, particularly in that

    (a)    PLAINTIFF was not suspected of committing any crime;

    (b)    The most serious crime *in consideration* that night was the nonviolent attempted burglary of a charity food pantry;

    (c)    PLAINTIFF was posing no risk whatsoever to the safety of the assailant officers or anyone else; and

    (d)    PLAINTIFF was neither resisting arrest nor trying to evade arrest by flight.

44. The CITY's deployment of a police attack dog to search or otherwise prowl the halls of an operating church was irresponsible and therefore unreasonable.

45. The CITY's deployment of CAESAR specifically to search or otherwise prowl the halls of an operating church was irresponsible and therefore unreasonable, owing in particular to CAESAR's inadequate training and lack of certification.

46. The CITY's use of Defendant JONES as CAESAR's handler was irresponsible and therefore unreasonable, owing to JONES's inadequate training and lack of certification as a canine handler.

47. Defendants engaged in the acts and omissions described above under color of state law as either municipal police authorities or agents and employees thereof.

48. The violations cited under this count caused PLAINITFF grievous injury—including medical expenses, pain and suffering, and past and future emotional distress.

49. The CITY's continued employment of Defendants DAVIS and JONES after multiple incidents of these officer's gross misconduct, moral turpitude, and contempt for MPD written policy, but for which these two unfit officers would not have been in the field, was another proximate cause PLAINTIFF's injury.

## IX.

## PENDANT CAUSES OF ACTION

50. The allegations set forth in paragraphs 1–50 are reiterated and incorporated by reference as if fully stated hereunder.

51. The above-alleged acts and omissions constituted common-law battery and assault on part of Defendants DAVIS, DEBOWES, HILLERMAN, JONES, TUCKER, or some combination of these persons.

52. The above-alleged training and certification deficiencies for CAESAR and his handler constituted negligence, gross negligence, or both on part of the CITY and Defendant BOWEN.

53. The violations cited under this count caused PLAINTIFF grievous injury—including pain and suffering and past and future emotional distress. The acts and omissions constituting battery and assault were sufficiently egregious, conscience-shocking, and outrageous to entitle PLAINTIFF to punitive or exemplary damages.

## X.

## REQUESTED RELIEF

54. WHEREFORE, Mr. MAXWELL respectfully demands the following relief:

A. That process issue and Defendants be required to fully answer or respond to this Complaint within the time and manner provided by law;

B. That upon a trial, Mr. MAXWELL be awarded money damages, both compensatory and punitive or exemplary, in an amount to be determined according to the proof, but in no event less than **TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000)**;

C. That, upon prevailing in this action, in addition to damages, Mr. MAXWELL be awarded any and all costs, expenses, and reasonable attorney fees available by law; and

D. Such other and further relief as the Court may deem just and proper under the circumstances.

§         §         §

Dated January 24, 2022.

        Respectfully submitted,
        **APPERSON CRUMP. PLC**

        /s/ *Jacob Webster Brown*
        Jacob Webster Brown (TN 36404)
        6000 Poplar Avenue, Suite 150
        Memphis, Tennessee 38119
        Telephone:  (901) 756-6300
        Facsimile:   (901) 757-1296
        jbrown@appersoncrump.com
        *Attorney for Plaintiff*